Mr. Childress, whenever you're ready, we'll be glad to hear from you. Good morning, Your Honor. May it please the Court, my name is Andrew Childress. I'm here today on behalf of Almaz Nezirovic. This was an appeal of a habeas denial from district court in connection to an extradition to Bosnia. The lower court granted the extradition and he filed his habeas petition which was then heard and denied and has been appealed before this honorable court. This case revolves around broadly sort of two sections. One involving the statute of limitations under Article 7 that's in the treaty between the United States and Bosnia and the second broadly is a political offense, type of political action defense against being extradited under any treaty, kind of under the law. They're two very different, under the law they don't have a lot in common but those are broadly the two areas that have been basically brought before this court. Article 7 of the treaty basically says if we're going to extradite somebody, if the crime that they've alleged have been committed, if the statute of limitations for that particular crime had it been committed in the United States has run, then we cannot extradite them. But if that statute of limitations has not run, then move forward with the extradition. And basically invoking U.S. law has created a lot of argument in this case and a lot of argument with other treaties with similar language which is not an uncommon article to have in treaties because we are now looking at United States law comparatively to Bosnian law. Now there's a lot discussion in the case about dual criminality and the government saying that dual criminality does not apply under the language of this particular treaty based on some prior case law from the Supreme Court on down. But it certainly has the flavor of it at the very least because you have to look at a Bosnian crime and find an analog in the United States. And then when that analog is found in the United States, you have to determine what the statute of limitations for that analog crime is. And then you have to see when things were filed, when the crime was or invokes a shield under United States law of statute of limitations. It's not a sword, it's a shield for defendants to use to not be prosecuted for crimes they've alleged to committed. And that shield, just like the phrase due process, cascades into a lot of different disagreements or the argument between the government and Mr. Nazarovic is that that shield, I argue, creates an ex post facto environment. And that's kind of what the basic case is getting into because just like due process means a lot of... That's the only case that supports your position, right? I mean, the vast majority of cases don't apply ex post facto in this context, correct? That's right. That is certainly the biggest or the focus case for my position. It's very important because it's the same treaty and involves more serious allegations, but similar allegations. Allegations that also fall under the convention against terrorism, which obviously is at issue in the case as well. So I'd argue that factually, it's very much on point. The question is, it's different than all these other cases. And that's where I think part of the analysis has to rest with the actual treaty. Countries with some very, very narrow exceptions can create treaties between each other. The governments can. They call for all kinds of things. The United States could enter a treaty with another country that said, we are going to extend due process constitutional protections to all of your citizens that you want to extradite from our country to your country. And the other country could say, okay, and it be signed. Now the Valentine case narrows it a little bit, but it's an older case where they can't just say, if you ask for them, we'll send them no matter what, even if there are citizens. There are some limits judicially on the executive branch in that respect, but they're very small, very narrow limits. The executive has a lot of power to do treaties. It's a big part of their job. And in this particular case, I would argue that the language of the treaty between the United States and Bosnia, Article 7 in particular, but reading the document as a whole with Article 7 being part of it, creates a document which removes itself or jettisons itself from the legal analysis that basically says, this is civil. It's not criminal. Ex post facto is a criminal defense. It's a criminal protection. It's a criminal shield. We're not saying he did anything wrong. If he gets convicted in court over there, that's criminal, but this is civil. And this is a civil case. But this document, this treaty, I argue, indeed have to argue, is basically sidestepping that based on its language. Now, it's an old treaty. It's from 1907. And the case law is coming along all after this. So to argue that all this was bared in mind by the framers of this which is not a long document, but obviously has created volume upon volume of interpretation. So is it your position that the five-year statute of limitations applies? It is, Your Honor. All right. And even if we accept that position, you still have to overcome the tolling issue. And how do you do that under BASIC? Because the criminal report, which is the equivalent of an indictment or information, according to the prosecutor, tolls the statute of limitations. I would argue that BASIC in that respect is double-edged. Right, because BASIC is against you there. And I would argue that that is not, since it is not part of the court's ultimate reliance for their holding, it is not the primary rule of law to take away from that, but as part of the discussion. And also, my understanding is that it was not really litigated by the defendant in that case who was being extradited. That was put out there as part of the argument for the court and not engaged with an objection or engaged in debate. So kind of my position on that would be this is kind of our first go on that second hurdle, of which I have a lot more to jump over. But that is, that's key. If this document, if this criminal report is basically a grand jury indictment by another name, then that tolls the statute of limitations. Because again, we're opening the hood under federal U.S. law and opening the hood under Bosnian law and comparing the engines and seeing how they're the same and how they're different and what piece can fit in the other engine. So in this case, I would argue that that report on its face doesn't match any of the documents that we use in our system to commence the actual, or stop running the clock on statute, of those statutations. If you are indicted by a grand jury, the statute of limitations is running, even if they can't find you for a while. If there is an arrest warrant issued for you or a bench warrant issued for you, you are tolling that statute of limitations at that time because it's starting a process. If the police file a police report about you, that does not stop filing the statute of limitations clock from running. If the police do a police report on you, suspecting you of crime or even accusing you of a crime and supply it to the U.S. Attorney's Office or a Commonwealth Attorney's Office, that doesn't stop running the clock either. Part of our separation of powers is that a detached neutral judicial member, a magistrate most typically, gets involved in the process and they sign off on a document or the grand jury in their role, in their judicial role, signs off on an information. And at that time, it starts running. None of that happens with this report. They just send it to the prosecutor and the prosecutor may or may not do something with it. And in this case, something was done with it, but not until 2003, which is when the next step in their process takes place, which is most analogous to our system of having grand jury or having an arrest warrant or a bench warrant issue. That hurdle doesn't stop us there because then there's the CAT, the Convention Against Terrorism. And under the CAT that was adopted by both our countries, Bosnia in 93, United States in 94, made terror, or not terrorism, made torture, that causes severe bodily injury, a felony offense with no statute of limitations. So if that comes up, it doesn't matter what the report says because there's no statute of limitations on that offense. And the allegations are argued fit into that torture elements that have to be shown for probable cause to be extradited on it. My argument is that the ex post facto, which a long line of cases say doesn't count in civil cases, doesn't count in extradition, that I'm arguing is being adopted by this specific document by agreement of our countries to move it outside of that analysis. In that case, it's, you can't be charged with it under that protection. There's been some criticism of the court in BASIC that they're sort of mixing up, right, the one defense or shield of statute of limitations and a different one of ex post facto. But I would argue these go hand in hand just like a million other protections under due process. And reading this document as a whole, particularly with Article 7, they don't make sense if they're not together in this case. Just like due process doesn't make sense if you have a trial by jury if you're not allowed to talk in court. These things go together in a complete system and one part of the system doesn't work. So that's the next hurdle is the Convention Against Torture and how that plays into what we're looking at. So that's kind of my first issue. The political offense is not as hyper technical. There's a lot of cases on that with slightly different facts than what we're dealing with here, people blowing up buses, people doing things to victims that were civilians at all times. Under the facts of this case, the people who are alleged to have been injured by Mr. Nizarovac were prisoners and he was a guard at the jail. And there's evidence that they had been soldiers at one time. But again, under the agreements between our countries, once you get laid down your weapons, once you are captured, once you surrender, you transform yourself from that fine point, while very, very important, is completely lost on individuals on the field of battle and in the midst of a very violent conflict involving awful things happening on both sides of the fence in this conflict. And these individuals were alleged to have done where Mr. Niroziak was a guard. We can't ignore the difference between an individual who's walking on a street and murdered by another combatant and an individual who had been a soldier that had done terrible things that is now placed under your care and the hot blood that that can create, which is what the political offense was designed to take into account, that people aren't perfect and mistakes get made. But sometimes because of the heat of battle, it's a wiser choice not to turn over a losing combatant to the other side after there have been things that were done very wrong. These allegations are awful. This is a difficult argument to make. I'm going to be very candid about that. But it's one that is important for the court to review because this is an area of law that I think is developing. Obviously, these facts being so different than some other facts is important for this court to seriously consider and review. I see I have five seconds if there's any questions. Good timing. Thank you. Thank you. Ms. Wright. Thank you, Your Honor. I am Elizabeth Wright, Assistant U.S. Attorney on behalf of Mr. Holt and Mr. Russell. May it please the court. Mr. Nazarovic raises no legitimate challenge to Judge Ballou's well-reasoned certification of his extradition to the Secretary of State. On habeas, Judge Urbanski properly accorded substantial deference to Judge Ballou's findings of fact, and both courts correctly rejected the two challenges that Mr. Nazarovic raises here, and they do so in detailed opinions. Mr. Nazarovic bore the burden of proof on each of these two issues, and he has not met it in this case. Before I turn to the timeliness argument, the limited scope of this court's review and the unique nature of extradition proceedings must be borne in mind as to both of the two issues before the court today. Extradition is an executive function with only a limited delegation of authority to the judiciary under the statute, which is Section 3184. The only question here is whether the torture charged is, quote, within the treaty, after having looked at both of Mr. Nazarovic's arguments and after having provided due deference to the magistrate judge's findings of fact. It also has to be borne in mind throughout this proceeding that extradition is not a criminal proceeding. There is no judgment of guilt against the fugitive, and there is no punishment. So rights that are accorded in criminal proceedings generally do not apply in this type of case. Turning then to the timeliness provision of the treaty, it does not bar Mr. Nazarovic's extradition. In this analysis, we need to start with the treaty's plain language, and the specific treaty provision here states that extradition shall not be granted if legal proceedings for the act committed by the person claimed has become barred by limitation according to the laws of the United States. Looking at the plain language here, this is a provision that looks specifically to statutes of limitations. It does not ask whether proceedings have become generally barred or if they're barred by something else other than a statute of limitations. Mr. Nazarovic's argument is in trying to incorporate additional protections that simply are not included in the treaty by its plain terms. The district court properly reasoned on this issue and said that it could not read additional protections into the treaty, and also that treaties such as this must be liberally construed in favor of their purpose, which is the extradition of fugitives to the requesting state. In looking to the statute of limitations analysis, courts look to the substantive offense under United States law, which is most closely analogous to the charged offenses. That's quoting from Sinai's versus Venables from the Ninth Circuit. There is no dispute in this case that the most analogous statute is section 2340A, which is the United States torture statute, and both of the lower courts here found that. In Bosnia, Mr. Nazarovic is charged with war crimes against civilians, which includes torture, and inflicting severe and lasting physical and emotional injuries on his victims through brutal beatings, and some of those beatings were focused specifically on three fingers that the victims used for prayer. He also is alleged to have subjected them to humiliating and degrading conduct otherwise, and there's evidence in the record, which is never disputed, and as to which the magistrate judge found that there were serious lasting injuries to victims from this conduct. The torture statute has no statute of limitations in cases involving serious bodily injury, so because there's no U.S. statute of limitations to apply in this case, there's no timeliness issue under the treaty. The real claim that Mr. Nazarovic is raising is simply an attempt to import ex post facto protections into this treaty, contrary again the plain language of the treaty, and going against the reasoning of both of the lower courts here. Ex post facto has no place in an extradition proceeding. There is clear Supreme Court precedent to this effect and other long-standing precedent that lays this out and governs on this issue. The first case that does govern here is the Supreme Court's decision in Nili, which at 180 U.S. at 122, stated that provisions that explicitly included ex post facto, quote, have no relation to crimes committed without the jurisdiction of the United States against the laws of a foreign country. This is very clear language and a strong statement that ex post facto has no relation to this type of provision. Mr. Nazarovic's counsel refers to case law developing sort of all after this treaty came into effect, and that is incorrect. Nili was a 1901 Supreme Court decision, basically at exactly the same time as this treaty came into effect, and there are, as Judge Thacker noted, there is a long line of cases that follows this type of authority. An appellate decision is the Oppenheim case out of the Second Circuit, which is exactly on point for the issues here. In that case, quoting the Oppenheim decision at 955, the court was addressing an argument based on the scenario that, quote, at the time of the commission of the alleged offense, there was no statute in force in the United States rendering criminal the exact act for which the fugitive was indicted in Scotland. A statute was later enacted in the United States, and then after that, Scotland submitted an extradition request. The court specifically looked at an ex post facto argument there and rejected that challenge, stating specifically that in the context of an extradition, because this is not, again, a criminal proceeding and it doesn't provide any punishment, quote, all talk of ex post facto legislation is quite beside the mark. That case has been followed by many cases, both dealing with statutory questions and treaties that include the Galena case, Hilario, McMullen, Murphy, and Demyanyuk. And in Demyanyuk, it's also particularly telling because in that case, they found that even the fact that the country requesting extradition didn't exist when the committed did not bar extradition. So there is a whole host of authority here that finds that there simply is no place for ex post facto protections in an extradition proceeding. So accepting Mr. Nesrovic's position here would go against all of these cases as our district court properly reasoned. This principle comes from the long line of cases on ex post facto principles that are laid out by the Supreme Court in other cases, such as Daubert and Weaver and Johanneson that we discussed in the brief that basically say that statutes are only in violation of the ex post facto clause if they change the punishment or have other effects that just aren't involved in this case because this is an extradition proceeding. There's also a general rule of law in extradition that you apply the law at the time of the demand, which here is the current United States law. And in my opponent's argument, he made the statement when he was transitioning from the timeliness issue to the political offense exception issue that the political offense exception was less of sort of he quote a hyper technical argument. And I think that's a important point here because in the extradition context, these are treaties that should be interpreted in order to effectuate extraditions. And a hyper technical analysis, which is what we think the Vosage court went into and what Mr. Nesrovic is proposing here, is not allowed in the context of these treaties. Also, Mr. Nesrovic's argument does essentially conflate two different terms of the treaties in terms of his claim that dual criminality applies here and the statute of limitations inquiry. And these two inquiries, as the ninth circuit said, for instance, in Theron versus United States Marshall are distinct and they need to be treated separately as our lower courts did in this case. Even if the court were to disagree on these issues, we then turn to the tolling issue and it's clear on the back. Let me ask you a question. I'm going to get you to switch gears a second. I want to ask you about the political offense exception to extradition. Of course, Your Honor. Are crimes against nations or crimes against the laws of armed conflict, torture, degrading treatment of prisoners, are they categorically excluded from consideration as a political offense? They are, Your Honor. And there are multiple cases that follow this approach and say very clearly that torture is not a political offense. This case law derives from a variety of sources. I mean, one point to start with is that as the Siderman court said in the ninth circuit, the prohibition against torture is a right deserving of the highest status under international law. The new rule versus Gonzalez ninth circuit case in 2005 continued in this theme saying the prohibition against torture, on torture, I apologize, is categorical. Even in war, torture is not authorized. The cases that follow this include Marsuk, Demyanyuk, Atmad. Basically, the law is very clear that if you have conduct such as we have in this case, one does not even reach the political offense exception analysis. The other authority for this includes from the Ordinola case, Your Honor. The court there noted that we have to defer to the State Department's interpretation. And the State Department has stated and has been quoted in a variety of cases as stating, again, that the political offense exception is not applicable to violent attacks on civilians. In this case, we have the authoritative affidavit of the Bosnian prosecutor that explains the Bosnian law on this topic and that all of these individuals were civilians. And Mr. Nezirovic's counsel refers to this slightly about former combatants potentially, but the law is at first, their status as civilians cannot be disputed in these proceedings. That would be a question for the court in Bosnia based on the limited nature of these extradition proceedings and the probable cause inquiry. But here, individuals, by definition, who have, even if they were combatants or members of the armed forces, if they have laid down their arms and been placed or to combat by detention or any other cause, they are civilians. That is outlined by the Bosnian prosecutor's affidavit to which we defer factually and also under the Second Circuit's Skeptoros decision that is really basically the end of the matter in terms of Bosnian law in this case. And he makes clear that these are civilians, consistently with the Geneva Conventions of 1949 that had a similar definition to that effect. So courts regularly reject the exception on very similar grounds to here. Some of the district court cases that specifically deal with individuals in custody and reject the application of the political offense exception includes Suarez, Mason, Artrukovic, also was dealing with disarmed prisoners, Demyanyuk. And each of these cases really make clear that you cannot have the exception on these facts. If the court does proceed to the full analysis of the political offense exception, it is inapplicable based on Mr. Nesorovic's own testimony at the extradition hearing. The court outlined in Ordinola that there are two prongs to this analysis and looking to the incidence test, Mr. Nesorovic would have had to prove a political purpose of his conduct, both objectively and subjectively. Based on the nature of this conduct, as I've been talking about, he cannot meet the objective prong because the case law is clear not only basically that torture is beyond the scope of the political exception completely, but also that acts of torture can bear no objective connection to a political purpose. Would your position be the same if the allegation against him were waterboarding? The law is clear, Your Honor, that torture is beyond the scope of the exception. I know there was a report dealing with some of the issues of waterboarding that came out previously. I'm not prepared to address that today, Your Honor, but the key point here is that Mr. Nesorovic raised no challenge whatsoever to the probable cause finding in this case. There is no dispute at all that the acts alleged against him by Bosnia constitute torture, and that is what is dispositive in this case. He fails also on the subjective prong of the test because in his testimony, Mr. Nesorovic explicitly disclaimed any political purpose as the magistrate judge found, and that finding can only be reversed for clear error and specifically in the context of the political offense exception, could only be reversed if a reasonable fact finder would have no choice but to conclude that the offender was acting in furtherance of a political uprising. So this is a very deferential standard, and Mr. Nesorovic testified, which is at the Joint Appendix at page 321, that he joined, quote, any army which can defend me and my family. It doesn't matter who and what. So he was very clear that at that point he was just motivated by what is a personal purpose of protecting self and his family. He also admitted that his job as a guard at the camp was, quote, just keeping people locked up, which is in the Joint Appendix at page 323. So as the magistrate judge properly concluded, he did not enlist in the army for any deep-rooted political reason. He explicitly says this was a personal reason, and this is the type of reason that courts have found, such as in the abject decision, to be simply a personal reason. And the specific conduct that's alleged went well beyond his duties to guard the prisoners in this case. The testimony he provided, in fact, is only as to why he joined the HVO in the first instance. He did not provide any testimony on the specific conduct here, and that separately would rule out applicability of the exception, because under Ordinola and Ian and the other cases, the fugitive would have to provide evidence as to why these specific acts alleged had a political purpose. And the evidence here and the findings of the court to which we defer do not provide any sort of even approach down this path of justifying his conduct under the political offense exception. If I may just return briefly to the tolling argument, Your Honor, there were several things that Mr. Nesero's counsel said that I wanted to respond to. One point is that the question of the 1993 charge was specifically and fully briefed in the Bostitch decision. The briefing includes docket entries 36, 37, and 43 in that decision, and part of their holding was definitely the tolling issue, and that this 1993 charge told the statute of limitations under Bosnian law. There are two avenues for finding the tolling in this case. Under the first test, which comes from Cherry v. Reich, anything that tolls Bosnian law satisfies United States tolling, tolling for purposes of United States law. And here we have the authoritative affidavit of the Bosnian prosecutor that makes clear that this 1993 charge initiated criminal proceedings and it tolls the statute of limitations in terms of functional equivalence really only comes into play at all in cases where there isn't this type of authoritative evidence from the government that's requesting extradition. The functional equivalence test is looking at documents such as arrest warrants, and almost all of these cases deal with arrest warrants, and are trying to basically effectuate purposes of the treaty and give credit to documents in other systems that don't have a true initiating document in the manner that the United States system has. Bosnia's system is not like the United States. It is a very different system. For instance, an individual cannot be indicted in Bosnia unless they are physically present, but Mr. Bavarovic's affidavit makes very clear that the 1993 charge is what initiated criminal proceedings in Bosnia, and it is also the functional equivalent of a United States information. It includes details about the charge, it specifically identifies him, and it's apparent in the other documents in the case that this was the document referred back to that opened the case. For instance, the April and May 2003 documents refer to a criminal case as having been opened, and that was by the 1993 document. So under either way of looking at tolling, either the cherry test or looking at whether an initiating document exists that's an analogy under the functional equivalence test, that requirement is satisfied and there is no timeliness issue at all under the treaty. So based on that, Your Honor, the Secretary of State should be allowed to proceed to its ultimate decision on Mr. Nazarovic's extradition and surrender. Thank you. Thank you. Mr. Childress. Both, as far as the standards of review goes, both extradition hearings and habeas corpus hearings, the court gives a lot of deference at those hearings to extraditing people or to keeping the person locked up. That's correct. I would say that this court at this stage is reviewing those rulings under a de novo standard because we're talking about questions of law or mixed questions of law in fact, but not questions of fact. So she's not wrong, this government's not incorrect, but this is a de novo review, but a de novo review of basically a very deferential standard. So I understand that we just don't throw out that standard, but also this court is kind of looking at this with a lot more power than would be suggested just by looking at the standards that are required at the lower courts. Our argument is, in connection to Oppenheimer, is not that we have to upset extradition law that's been on the books since 1927. To quote the case at the very end where the court is citing the Digestive International Law, extradition treaties, unless they contain a clause to the contrary, cover offenses prior to their conclusion. And where no special stipulation on the subject is made, the exchange of ratifications has a retroactive effect. So that's the standard, but the standard can be changed by the agreement, which is what I'm arguing is happening here. I'm not asking the court to throw out how we examine treaties or extradition rulings from the Supreme Court on down, but I am saying that this statute, as interpreted in the basic case, basically carves out that allowed to do. So that's my sort of ruling on that as far as kind of upsetting the apple cart on res judicata, that this is not to have that sweeping effect. We're talking about this particular treaty under these particular facts and timings of the charges. There was discussion that, hey, in Bosnia, this complaint tolls the statutes of limitations. Period. Stop. Okay. I'm not asking the court to interpret the correctness or incorrectness of that. Okay. I'll accept that. In Bosnia, that's how it works. The treaty says you use the law here, the statute of limitations. We're not interpreting Bosnia. So I appreciate that the prosecutor let us know that. Under the treaty that he's part of, we're interpreting US law, US statute of limitations under an analogous US charge, crime. And so we use our law about when the clock starts running. And it's part of our checks and balances that here, we don't start the clock until there's a judge or a grand jury involved or a magistrate. It's not just the executive that starts it rolling. In Bosnia, they do that. Okay. But the treaty says the law here. And that document here doesn't work to toll the statute of limitations, which is what the treaty says we got to look at. In connection to the political offense argument, there has to be a war going on. And part of what the government was saying is that the conduct has to be political too. You can't just randomly hurt people. And that this was done sort of apolitically. I'd argue that there is factors in the record that dispute that specifically from Bosnia that is mentioned in the government statement that there's a check salute that involves three particular fingers. And these fingers were hit or broken. That's a political organization. That's a salute that they use. And then this was an alleged injury that was done. I think the political connection is very clear that this wasn't somebody just breaking random fingers or hurting people randomly, but doing it in a political context. It's very uncomfortable. But it's on the record. And it is a defense in this. Because it recognizes how complex this is. So I would argue that the record does show that he joined a political organization, HVO. It's part of an army. It's not a club. It's not a motorcycle gang. They had uniforms. They ran a jail. They had a political agenda. And he signed up for it because that political agenda aligned with what he personally wanted to protect. And people politically join organizations all the time because that organization reflects their beliefs, their values, or what they feel is important. I see I'm out of time. Thank you. Thank you, Mr. Childress. I know you're a we appreciate very much your undertaking representation of this client. It's my privilege just to be in the rooms. Thank you.
judges: William B. Traxler Jr., Barbara Milano Keenan, Stephanie D. Thacker